**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **JAMES G.M.,**[1] | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Case No. 3:20-CV-01070-MAB** |
| | ) |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** | ) |
| | ) |
| **Defendant.** | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423.[2]

## Procedural History

Plaintiff protectively filed an application for SSI on or around May 21, 2018, alleging a disability onset date of December 16, 2016 (Tr. 13; 170). The claim was denied and appealed twice (Tr. 73, 77, 80, 83). The claim proceeded to a hearing before Administrative Law Judge ("ALJ") Lisa Leslie, who denied Plaintiff's application on March 10, 2020 (Tr. 13-22; 27-45). The Appeals Council denied Plaintiff's request for

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (*See* Doc. 20).

review on August 24, 2020, making the ALJ's decision the final agency decision subject to judicial review (Tr. 1-3). Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following issue:

The ALJ failed to properly evaluate Plaintiff's Residual Functional Capacity ("RFC") because the ALJ failed to account for the deficits of concentration, persistence, and pace in the RFC.

## Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order. 20 C.F.R. § 416.920(a)(4). The first question is whether the claimant is presently engaged in substantial gainful activity? *Id.* If the answer is yes, then the claimant is not disabled regardless of their medical condition, their age, education, and

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.,* and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.,* and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

work experience. *Id.* at § 416.920(a)(4)(i), (b). If the answer is no, and the individual is not engaged in SGA, the analysis proceeds to question two. *Id.* at § 416.920(a)(4).

At question two, the ALJ considers whether the claimant has a medically determinable physical or mental impairment, or a combination of impairments, that is "severe" and expected to persist for at least twelve months? 20 C.F.R. § 416.920(a)(4)(ii), 416.909. If the answer is no, then the claimant is not disabled. *Id.* at § 416.920(c). If the answer is yes, the analysis proceeds to question three. *Id.* at § 416.920(a)(4).

At question three, the ALJ must determine whether the claimant's severe impairments, singly or in combination, meet the requirements of any of the "listed impairments" enumerated in the regulations. 20 C.F.R. § 416.920(a)(4)(iii). *See also* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1. (list of impairments). A claimant who meets the requirements of a "listed impairment" is deemed disabled. 20 C.F.R. § 416.920(d). For claimants who do not meet the requirements of a "listed impairment," the ALJ must then determine the claimant's residual functional capacity (RFC). *Id.* at § 416.920(e).

Then at step four, the ALJ must determine whether the claimant retains the RFC to continue performing their former occupation. 20 C.F.R. § 416.920(a)(4)(iv). If the answer is yes, then the claimant is not disabled. *Id.* at § 416.920(a)(4)(iv), (f). If the answer is no, the analysis proceeds to the fifth and last question, which is whether the claimant can make an adjustment to perform any other work. *Id.* at § 416.920(a)(4)(v). If the answer is yes, then the claimant is not disabled. *Id.* at § 416.920(g). If the answer is no, the claimant is found disabled. *Id.*

It is important to recognize that the scope of judicial review is limited. "The

findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein. "[W]e will reverse only if the record compels a contrary result." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (citation and internal quotation marks omitted).

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. She determined that Plaintiff had not engaged in substantial gainful activity since May 17, 2018, Plaintiff's application date (Tr. 15).

Plaintiff was born on December 16, 1997 and was 17-years old on the alleged disability onset date (Tr. 33). At step two, the ALJ found that Plaintiff had severe

impairments of depression, anxiety, learning disability, and borderline intellectual functioning (Tr. 15). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals an impairment listed in 20 CFR 404, Subpart P, Appendix 1 (Tr. 16-18).

The ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels as defined in 20 C.F.R. §404.1567(b) with the following non-exertional limitations:

> The claimant is limited to performing simple, routine, one-and two-step tasks. He can perform work with production expectations, but the work must not be at a fast pace such as an assembly line, where the initiation of another task would be dependent on the claimant's prompt completion of a task. The claimant is limited to a work setting with reduced social demands and where the work setting and employment-related social interactions are no more than occasional, and are brief and largely task-specific rather than collaborative. The claimant must work in a stable setting where there is little change in terms of the tools used, the process employed, or the setting itself, and change, where necessary, is introduced gradually.

(Tr. 19).

Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff did not have past relevant work (Tr. 21). Ultimately, the ALJ found Plaintiff was not disabled, though, because he was able to do other jobs that exist in significant numbers in the national economy (Tr.21).

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points and factual allegations raised by Plaintiff.

1.    **Evidentiary Hearing**

Plaintiff was represented by an attorney at the January 30, 2020 hearing. (Tr. 13; 27). At the time of the hearing, Plaintiff was 22-years old (Tr. 33). Plaintiff testified that he lived at home with his mother, father, and 20-year old sister (*Id.*). Plaintiff has only ever lived with his family (*Id.*). Plaintiff's highest level of education is high school, having graduated after completing his coursework. To help him in high school, he was in special education classes for history, science, and math (*Id.*).

The ALJ questioned Plaintiff about how his disabilities impact his ability to work. Plaintiff explained that his anxiety and depression "kick in" a lot and he has short-term memory loss, which manifests in his inability to count money, pay bills by himself, and live on his own, for example (Tr. 34). Plaintiff testified he does not have any friends and just sits in his room all day (Tr. 39). Occasionally, he will take out the trash (*Id.*). Plaintiff has to be reminded to shower and wash his hair, and needs help from his mother to shave his face (*Id.*). Plaintiff does not go to the grocery store or cook, but he does watch television (Tr. 40). Even while watching television, though, he gets lost in the stories and has to ask questions about what happened (*Id.*). He explained that he experiences anxiety more than depression and, on average, around four days a week (*Id.*). Plaintiff further explained that his anxiety manifests in shaking and an inability to control himself (*Id.*).

The ALJ questioned Plaintiff about his prior work history. Plaintiff testified that his longest job was at McDonald's, where he worked for three months (Tr. 34). He got this job through an organization called "Doors," which Plaintiff described as a place that helps people find jobs (Tr. 34-35). Plaintiff described that the job was going well until he

was instructed to make sandwiches *and* burritos, and he could not remember how to make the different sandwiches (*Id.*). He described that people there made fun of him for not remembering how to make the different sandwiches, which spiked his anxiety and depression (Tr. 35). So, he called in sick "all the time" because he didn't want to go, which resulted in his firing because he took too many (approximately 8) sick days (*Id.*). Plaintiff elaborated that he had to be retaught how to make these sandwiches every shift (*Id.*). After being fired from McDonald's, Plaintiff worked at a Hershey factory plant for about three weeks (Tr. 35-36). Plaintiff also got this job through "Doors," or, "Challenge Unlimited," and was fired because the job was fast-paced and he could not keep up (Tr. 36).

Plaintiff also worked at a hospital as a dishwasher, which he reports was "ok" until they had him deliver items to different rooms and he got lost (*Id.*). He was fired from that job because he did not deliver the right food to the right rooms (*Id.*). Plaintiff testified that he got this job through a co-op he did while in high school, where he worked at this job during high school and was hired on after graduating (Tr. 37). This was Plaintiff's first job out of high school (*Id.*).

Plaintiff testified that he takes medication for his anxiety and depression, as well as attends counseling every two weeks (*Id.*). He takes medications for what he describes as "meltdowns"(*Id.*). He has meltdowns about twice a week, but sometimes more, and these meltdowns are usually triggered by his depression and anxiety kicking in (Tr. 37-38). During the meltdowns, Plaintiff cries, shakes, and describes that he sometimes breaks things, including punching walls (Tr. 38). Usually, the meltdowns last about fifteen

minutes and while the medication helps them, the "medicine doesn't make them disappear" completely (*Id.*). Plaintiff was approved for an emotional support dog, recommended by his counselor, who helps calm him during meltdowns (Tr. 39).

A VE also testified at the hearing. The VE testified that her testimony was consistent with the DOT and based on her experience in job placement (Tr. 43-44). The ALJ asked the VE to assess a hypothetical person the same age and with the same education level as Plaintiff with a moderate limitation in ability to understand, remember, and carry out detailed instructions, as well as a moderate limitation to maintain attention and concentration for extended periods of time (Tr. 41-42). This individual is therefore limited to performing simple, routine, one- and two-step tasks, and can perform work with production expectations, but the work must not be at any fast pace (such as an assembly line) where the initiation of the task would be dependent on the individual's completion of the prior task. Additionally, the individual has a moderate limitation in the ability to interact with the public and to accept instructions and respond appropriately to criticism from supervisors, so the individual is limited to a work setting with reduced social demands and where the work setting and employment related social interactions are no more than occasional and are brief and largely task-specific rather than collaborative. Finally, the work setting must be stable with little change in terms of the tools used, process employed, and the setting itself. Any change should be introduced gradually (Tr. 42).

In response to this hypothetical, the VE testified that this hypothetical individual could work as a hand packager (DOT 920.587-018) with an exertional level of medium,

unskilled, and a Specific Vocational Preparation ("SVP") level of 2 [4] , of which approximately 300,000 jobs exist nationally (Tr. 43). This hypothetical person could also work as a bakery worker (DOT 524.687-018) with an exertional level of light, unskilled, and with an SVP of 2, of which there are approximately 400,000 jobs nationally. Finally, this hypothetical person could also work as a laundry worker (DOT 361.687-018) with an exertional level of medium, unskilled, and with an SVP of 2, with approximately 210,000 jobs nationally (*Id.*).

The ALJ then asked the VE to assume the same hypothetical limitations except that this time, the VE should assess someone who requires reminders of tasks six times a day and needs to have their work checked six times day (*Id.*). He VE explained that this hypothetical person would not have any competitive work available to them (*Id.*). The ALJ asked if this person could have no interaction with coworkers, supervisors, or the public, would that impact their ability to work, and the VE explained that it would eliminate work for this person (*Id.*).

Plaintiff's attorney questioned the VE, and asked where she found the numbers of the jobs in the national market. The VE explained that she obtained them from the Bureau

---

[4] Specific vocational preparation, or "SVP", is the amount of time required for a typical claimant to: learn the techniques, acquire the information, and develop the facility needed for average performance in a job. A claimant may acquire SVP in a school, military, institutional, or vocational environment through such settings as: vocational training, apprenticeship training, in plant training, on-the-job training, and essential experience in other jobs. For example, a registered nurse has an SVP of seven, which means that a claimant can learn this job in about 2-4 years. If the job is assessed as an SVP of 1, it means that only a short duration is needed to learn the job. In this case, a 2 means that it would take up to 1 month to learn the job. *See here* DI 25001.001 Medical and Vocational Quick Reference Guide, available at https://secure.ssa.gov/poms.nsf/lnx/0425001001#a7 (last accessed March 15, 2022).

of Labor Statistics and any modifications or reductions of the numbers from the Bureau

of Labor Statistics was based on the factors in the hypothetical, mostly regarding pace

and one- and two-step tasks (Tr. 44).

### 3.     Relevant Medical Records

Plaintiff submitted medical records from a variety of providers to aid the ALJ in

his determination that range from around August 2017 through January 2019 (Tr. 290-

379).

Plaintiff submitted records from his primary care physician, MultiCare Specialists

PC, in Granite City, IL. Specifically, he saw Dr. Rodney L. Lupardus, MD, who recorded

notes about Plaintiff's depression, anxiety, and learning disabilities.

For example, a treatment note from September 13, 2017 indicates that Plaintiff

started taking Lexapro the month before and while it seemed to be helping his anxiety,

he still had outbursts of anger (Tr. 300). The note further explains that Plaintiff has

difficulty obtaining and maintaining a job because of his learning disabilities (*Id.*).

Additionally, Plaintiff lost his job as a warehouse worker because he could not multitask

and "keep up" (*Id.*).   A treatment note from October 12, 2017 indicates that Plaintiff is

taking Lexapro and Seroquel, which helps his mood, but is causing excessive sleepiness.

The medical note indicates that Plaintiff is "still" looking for a job and will be going

through an agency, Challenge Unlimited, which helps "handicap people" find jobs (Tr.

298).

In the next note, recorded on February 19, 2018, Dr. Lupardus indicates that

Plaintiff has stopped taking Lexapro and Seroquel "because he felt like his mood was

doing better" (Tr. 292). The note indicates that Plaintiff has been working at McDonald's for a little more than a month, since January 2, 2018 (*Id.*). By June 21, 2018, Dr. Lupardus records that Plaintiff lost his job at McDonald's "because he was very anxious and missed work frequently" (*Id.*). He indicates that Plaintiff does have some suicidal ideations, threatening (at times) to run his car off the road, but that he is scheduled to see a counselor this week (*Id.*). Also included in the records is Dr. Lupardus' recommendation that Plaintiff get a support dog, which was signed on August 27, 2019 (Tr. 339).

In addition, Plaintiff submitted medical records from some of his counseling sessions with Healing Hope Counseling, an Independent Contractor for Cornerstone Counseling, PC (Tr. 305). In the May 24, 2018 counseling note, the counselor indicates that Plaintiff had a job at McDonald's, but that he got upset and would call off and so he was fired (*Id.*). The therapist initially diagnosed Plaintiff with generalized anxiety disorder and indicated that he sought therapy for medication and behavior management, as he had recently lost his job at McDonald's due to his anxiety (Tr. 311). In the behavioral, emotional, and physical functioning checklist, Plaintiff's counselor indicated Plaintiff felt depressed, helpless, and exhibited thoughts of death and dying, while also experiencing problems concentrating and uncontrollable crying spells (Tr. 309). Additionally, Plaintiff had mood swings, difficulty controlling his temper, and restlessness (*Id.*). He is an excessive worrier, and will tremble, have heart palpitations, sweating spells, nausea, and chills (*Id.*).

4.     **Plaintiff's Individualized Education Programs**

Included in Plaintiff's records is his Individualized Education Program (IEP) from

when he was in high school. The Individuals with Disabilities Education Act (IDEA) is a federal special education law that ensures public schools serve the educational needs of students with disabilities. The IDEA requires that schools provide special education services to eligible students as outlined in their IEPs in order to guarantee that child a free appropriate public education (FAPE).[5]

In Plaintiff's 12th grade October 4, 2016 IEP, his teachers indicate that he is able to recognize "some" sight words, but has tested below average in reading comprehension (Tr. 383). Additionally, he is able to perform one and two step numerical operations, but has also tested below average in math problem solving and numerical operations (Tr. 270). There is a second copy of this IEP in the record as well (Tr. 268).

5.    **Agency Forms**

In a Function Report submitted on July 19, 2018, Plaintiff described experiencing depression and anxiety, as well as having a learning disability (Tr. 210). He explained he cannot multitask and has a hard time "keeping up with what people want me to do," which has cost him multiple jobs due to being "too slow" (*Id.*). His chores around the house include taking the trash out and cutting the grass, but he explained that his parents mainly take care of him (Tr. 211). He can cook a frozen pizza, toast, waffles in the toaster oven, and microwavable popcorn (Tr. 212). While he can drive a car, he doesn't go too far from home because he gets scared and confused (Tr. 213). He will go to the grocery store with his girlfriend sometimes, but does not go alone, and his mom pays his bills (*Id.*). He

---

[5] *See* National Center for Learning Disabilities, Learn the Law: IDEA, available at https://www.ncld.org/get-involved/learn-the-law/idea/ (last visited March 30, 2022).

also likes swimming and going to Six Flags with his girlfriend (Tr. 214). He has a hard time understanding instructions if they are not given to him one at a time (Tr. 215). Additionally, he cannot focus in a fast-paced environment (*Id.*).

Plaintiff's mother, Denise Marler, also submitted a Function Report, dated July 23, 2018 (Tr. 218), in which she described that it takes Plaintiff a long time to learn and comprehend things (*Id.*) . Additionally, he cannot multitask (*Id.*). With that said, he does care for pets by feeding them and taking them for walks with her help and reminders (Tr. 219). She explained that Plaintiff does not like to shave, so he needs help (*Id.*). Additionally, she helps him get dressed by laying out his clothes and she reminds him to bathe sometimes (*Id.*). Plaintiff can cook a frozen pizza or microwave popcorn, but cannot prepare meals that are not microwavable (Tr. 220). His household chores include cleaning his room, mowing the grass, and taking the trash out (*Id.*). In terms of money, Plaintiff can count bills "a little," but has "no concept" of how much he should pay or get in change when he is at a store( Tr. 221). Plaintiff's mother indicated that he has a girlfriend and sees her about once a week (Tr. 222). He gets angry easily and has meltdowns, during which he gets frustrated (Tr. 223). He asks his mom why he can't be "normal" (*Id.*).

**5.    State Agency Consultants' Opinions**

In connection with Plaintiff's application for benefits, the ALJ also considered evidence and opinions from State Agency Consultants.

 M.W. DiFonso, PsyD., completed a Disability Determination Explanation report dated July 26, 2018 at the request of the State agency (Tr. 46-55). Dr. DiFonso noted that Plaintiff was applying for benefits based on diagnoses of anxiety, depression, and autistic

tendency (Tr. 47). After recording that he did not have contact with Plaintiff (as he determined a consultative examination was not necessary), Dr. DiFonso described that Plaintiff has a developmental disorder and had an IEP for a specific learning disability based on his school records (Tr. 48). These records indicate Plaintiff was in special education 46% of his day. Dr. DiFonso indicates that Plaintiff started on Lexapro in August 2017 and then Seroquel was added in September 2017 (Tr. 49). After increasing his Lexapro in November 2017, Plaintiff stopped medication in February 2018. He reported a worsening mood in May 2018 (*Id.*).

Based on Plaintiff's impairments of depression, anxiety, and a learning disorder, Dr. DiFonso determined that Plaintiff had a moderate impairment in his ability to concentrate, persist, and maintain pace (Tr. 50). Specifically, Dr. DiFonso found that Plaintiff was moderately limited in the ability to carry out detailed instructions and maintain attention and concentration for extended periods of time (Tr. 52). Plaintiff was not significantly limited, though, in his ability to carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (Tr. 53). Dr. DiFonso also included an additional explanation, in the form of a narrative, detailing that Plaintiff is "capable of multiple step productive activity [with] modified social

demand" (*Id.*). Based on the records available to Dr. DiFonso, he determined that Plaintiff was not disabled (Tr. 55).

Russell Taylor, Psy.D., also completed a Disability Determination Explanation report at the reconsideration level dated December 17, 2018 (Tr. 58-68). Dr. Taylor also determined that Plaintiff was not disabled because, given Plaintiff's age, education, and RFC, Plaintiff could adjust to work (Tr. 67). With that said, Dr. Taylor noted that Plaintiff had depression, anxiety, and a neurodevelopmental disorder, which manifested in sustained concentration and persistence limitations (Tr. 63-64). Specifically relating to concentration, persistence, and pace, Dr. Taylor determined that Plaintiff was moderately limited in his abilities to carry out detailed instructions and maintain attention and concentration for extended periods of time (Tr. 65). Dr. Taylor determined Plaintiff was not significantly limited in his ability to carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; and make simple work-related decisions (Tr. 65). Dr. Taylor also provided an additional, narrative explanation in which he describes that Plaintiff "retains the mental capacity to understand, remember, and concentrate sufficiently in order to carry out one or two-step instructions for a normal work period. He could make simple work related decisions" (Tr. 66).

## <u>Analysis</u>

In this appeal, Plaintiff advances one main arguments in support of his contention

that remand is appropriate. He asserts that the ALJ erred in not appropriately developing the RFC to account for Plaintiff's deficits in concentration, persistence, or pace (Doc. 24, p. 5). Specifically, Plaintiff argues the ALJ failed to address his moderate limitation in his ability to maintain attention and concentration for extended periods of time in the RFC and the ALJ did not reconcile her findings with the opinions of Drs. DiFonso and Taylor (*Id.* at pp. 10-11).

Defendant disagrees, arguing that there is substantial evidence to support the ALJ's RFC assessment and that the ALJ reasonably considered the objective evidence of mental limitations in formulating the RFC (Doc. 29, pp. 2-3). Additionally, Defendant argues that Plaintiff has failed to point to a portion of the record that supports finding a greater limitation than that assessed by the ALJ; therefore, remand is improper (*Id.* at pp. 7-8). In fact, Defendant argues that the record, as a whole, fully supports the RFC determination.

Plaintiff's general argument is that the ALJ did not properly develop the RFC. The RFC is a measure of what an individual can do despite his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000–01 (7th Cir. 2004); 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of a claimant's RFC is a legal decision rather than a medical one. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014). "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing' basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). "The RFC assessment is

a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3.

Seventh Circuit precedent outlines how an ALJ must assess a Plaintiff's established limitations in concentration, persistence, and pace (CPP). If the ALJ finds that a plaintiff has a moderate limitation in maintaining CPP, that limitation must be accounted for in the hypothetical question posed to the VE. In most cases, limiting the plaintiff to simple, repetitive tasks or to unskilled work is not sufficient to account for moderate concentration difficulties.   *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619-620 (7th Cir. 2010). In fact, the Seventh Circuit has repeatedly held, with exceptions not applicable here, that a limitation to simple, repetitive tasks or unskilled work does not adequately account for a moderate limitation in maintaining CPP. For example, in *Stewart*, the Seventh Circuit observed, "The Commissioner continues to defend the ALJ's attempt to account for mental impairments by restricting the hypothetical to 'simple' tasks, and we and our sister courts continue to reject the Commissioner's position." *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009). The Court has reaffirmed that position several times in recent years. *See O'Connor-Spinner, supra; Yurt v. Colvin,* 758 F.3d 850, 857 (7th Cir. 2014); *Varga v. Colvin,* 794 F.3d 809, 814 (7th Cir. 2015); *Taylor v. Colvin,* 829 F.3d 799, 802 (7th Cir. 2016); *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018), as amended on reh'g (Apr. 13, 2018).

In *Winsted v. Berryhill*, 915 F.3d 466 (7th Cir. Feb. 8, 2019), the Seventh Circuit stated, "Again and again, we have said that when an ALJ finds there are documented limitations of concentration, persistence, and pace, the hypothetical question presented

to the VE must account for these limitations. [Citations omitted.]   We have also made clear that in most cases 'employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace, and thus, alone, are insufficient to present the claimant's limitations in this area." *Winsted*, 915 F.3d at 471.

In *Winsted*, at step three, the ALJ found that the plaintiff had moderate difficulty with social functioning and CPP. The RFC assessment limited plaintiff to "simple, routine, repetitive tasks with few workplace changes, no team work, and no interaction with the public." *Winsted*, 915 F.3d at 470. The Court held that the hypothetical question based on that RFC assessment was erroneous because it "did not direct the expert to consider problems with concentration, persistence, and pace, which is the hypothetical the ALJ relied on for the RFC. Though particular words need not be incanted, we cannot look at the *absence* of the phrase 'moderate difficulties with concentration, persistence, and pace' and feel confident this limitation was properly incorporated in the RFC and in the hypothetical question." *Winsted*, 915 F.3d at 471 (emphasis in original).

The Seventh Circuit held similarly in *DeCamp v. Berryhill*, 916 F.3d 671 (7th Cir. 2019). At step three, the ALJ found that the plaintiff had moderate limitations in CPP. The ALJ limited the plaintiff to "unskilled work with an SVP of 2 or less, with no fast-paced production line or tandem tasks, at a job that allows her to be off task up to 10% of the workday." *DeCamp*, 916 F.3d at 675. On appeal, the Seventh Circuit held:

> We agree that the ALJ erred by not including DeCamp's "moderate" limitations in concentration, persistence, and pace in the hypothetical question to the vocational expert. The ALJ's hypothetical to the vocational

expert omitted any mention of DeCamp's moderate limitations in the four areas identified by [state agency examiner] Dr. Pape (whose opinion the ALJ cited to support her finding): maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; working in coordination or proximity to others without being distracted; and completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace. The ALJ opted instead to limit DeCamp to "unskilled work" with no "fast-paced production line or tandem tasks." We have previously rejected similar formulations of a claimant's limitations because there is no basis to suggest that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including a moderate limitation on concentration, persistence,   and pace.

*Id.* at 675-676.

Similarly, limitations to "simple tasks not as a production-rate pace" are often insufficient. While the limitation to no production requirements, such as an assembly line, does address difficulties in maintaining pace, it does not address attention and concentration. *See Martin*, 950 F.3d at 374; *Varga* 794 F.3d at 815. The Seventh Circuit reiterated this point when it stated: "there is no basis to suggest that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including a moderate limitation on concentration, persistence, and pace." *DeCamp*, 916 F.3d at 676.

Even so, the Seventh Circuit *has affirmed* RFCs which use the exact, or similar, "simple, routine, and repetitive task" phrase when coupled with further explanation of how the plaintiff is limited. In other words, confining an individual to simple, routine tasks and limited interactions with others in an RFC is not always grounds for reversing and remanding. *Mischler v. Berryhill*, 766 Fed. App'x. 369, 376 (7th Cir. 2019). Rather, substantial evidence must support an RFC determination that a plaintiff with moderate

CPP limitations can perform simple, repetitive tasks. *See Recha v. Saul*, 843 F. App'x 1, 4 (7th Cir. 2021) (assessing whether substantial evidence supported the RFC determination that a plaintiff with moderate CPP limitations could perform simple, routine, repetitive work).

For example, in *Pavlicek v. Saul,* 994 F.3d 777 (7th Cir. 2021), two non-examining agency consultants reviewed the plaintiff's records and determined he had moderate limitations in CPP, but could still remember basic information and simple instructions, pay attention for up to two hours at a time, and perform at a consistent pace if engaged in simple, repetitive tasks. Following a hearing, the ALJ determined the plaintiff had the RFC to perform medium work with the certain exceptions, including that he was limited to carrying out simple instructions and routine, repetitive tasks. *Id.* at 781.

On appeal, the plaintiff argued the ALJ afforded too much weight to the non-examining consultants' opinions. *Id.* at 783. The plaintiff argued the consultants' opinions were internally inconsistent because they indicated the plaintiff had moderate limitations in CPP in the checklist portion of their evaluation, which conflicted with the narrative portions of the evaluation, in which the consultants opined the plaintiff could consistently perform simple, repetitive tasks. *Id.*

The Seventh Circuit found the ALJ reasonably relied on the consultants' opinions, citing *Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015), where the Court found "an ALJ may rely on a doctor's narrative RFC, rather than the checkboxes, where the narrative adequately encapsulates and translates those worksheet observations." In *Varga*, the consultant checked that the plaintiff had moderate limitations in CPP but did not provide

a narrative assessment. *Id.* The Seventh Circuit found that even though an ALJ may rely on a narrative portion of an evaluation, the ALJ there erred because there was no narrative portion that explained how the moderate limitations in the plaintiff's CPP affected his ability to function. *Id.*

In *Pavlicek*, the Seventh Circuit found the narrative portion of the medical assessment was consistent with the moderate CPP checklist rating because the Regulations define "moderate" as "fair," and "a moderate limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace." 994 F.3d at 783.[6]

---

[6] A note about the definitions in the Regulations. The Social Security Administration revised the Regulations in 2017 and some parties have, in the past and are continuing to, argue that these changes alter the analysis concerning a plaintiff's moderate limitations in CPP and undermine the Seventh Circuit precedent pre-dating the revisions. The relevant Regulation now provides the following definitions:

    a.  No limitation (or none). You are able to function in this area independently, appropriately, effectively, and on a sustained basis.

    b.  Mild limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited.

    c.  Moderate limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.

    d.  Marked limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis if seriously limited.

    e.  Extreme limitation. You are not able to function in this area independently, appropriate, effectively, and on a sustained basis.

20 C.F.R., Part 404, Subpart P, App. 1, § 12.00(F)(2).

The Paragraph B criteria for maintaining CPP provides the following example of a plaintiff's ability to focus attention on work activities and stay on task at a sustained rate:

Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing a task in a timely manner; ignoring or avoiding distractions while working changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day.

The holding in *Pavlicek* merely reiterates what the Seventh Circuit has stated for years—in certain circumstances, a moderate limitation in CPP may be accommodated by limiting a plaintiff to simple, repetitive tasks, but there must be evidence to logically support that determination. *See Capman v. Colvin*, 617 F. App'x 575 (7th Cir. 2015) (where an ALJ permissibly relied on a consultant's opinion that the plaintiff, who was moderately limited in CPP, could perform simple, repetitive tasks); *Recha v. Saul*, 843 F. App'x 1 (7th Cir. 2021) (affirming the ALJ's decision where the ALJ relied on state agency opinions that the a plaintiff with moderate CPP limitations could maintain attention for two hours at a time and persist at simple tasks over eight- and forty- hour periods); *Lockett v. Saul*, 834 F. App'x 236 (7th Cir. 2020) (affirming an ALJ's decision where the ALJ relied on testimony from a medical expert who expressly stated the plaintiff with moderate CPP limitations could perform simple, repetitive, routine work); *see also Bruno v. Saul*, 817 F. App'x 238 (7th Cir. 2020) (affirming an ALJ's decision where the ALJ explained in detail that she limited a plaintiff with moderate CPP limitations to simple tasks based on

---

20 C.F.R. § Pt. 404, Subpt. P, App. 1

The only rating that assures a plaintiff can function on a sustained basis in the area of CPP is the rating that the plaintiff has "no limitation." *Id.* Thus, a plaintiff with a moderate limitation still experiences limitations in CPP that must be adequately accounted for in the RFC. Further, the definitions of mild, moderate, marked, and extreme "do not represent a departure from prior policy" and are "consistent with how [] adjudicators have understood and used those words" in the past. Revised Medical Criteria for Evaluating Mental Disorders, 81 FR 66138-01. Also, the Seventh Circuit has continued to apply the same general principles governing cases involving moderate limitations in CPP, with no indication that the revised Regulation has altered the analysis. *See, e.g., Crump v. Saul*, 932 F.3d 567 (7th Cir. 2019) ("When it comes to the RFC finding, we have likewise underscored that the ALJ generally may not rely merely on catch-all terms like "'simple, repetitive tasks'" because there is no basis to conclude that they account for problems of concentration, persistence or pace.") (citing *Varga v. Colvin*, 794 F.3d 809 (7th Cir. 2015) and *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010)). *See also Dottie M.S. v. Commissioner of Social Security*, Case No. 3:19-cv-01225-GCS, 2020 WL 6134893 (S.D. Ill. Oct. 19, 2020).

evidence that the plaintiff's CPP struggles arose during complex undertaking, such as long tests but not during simple, repetitive tasks, such as the plaintiff's job at a bakery); *Jozefyk v. Berryhill*, 923 F.3d 492 (7th Cir. 2019) (affirming an ALJ's decision where the evidence showed the plaintiff's moderate CPP impairments surfaced only when he was around other people and the RFC adequately captured the context-specific limitation in CPP).

Here, Plaintiff argues that this case is similar to *Varga* and unlike *Pavlicek* (Doc. 24, p. 11). At step three, the ALJ found that Plaintiff had a moderate limitation in CPP based on Plaintiff's medical records, including progress notes from Healing Hope Counseling and Plaintiff's primary care physician that detail that he has intact thought processes, full orientation, fair to good judgment, and an understanding of his mental condition and reason for medication (See Tr. 16; See also, *e.g.*, Tr. 305, 317, 322). The ALJ also considered Plaintiff's full-scale IQ score of 74, as well, but discussed that Plaintiff can demonstrate some concentration and persistence while driving and watching television (Tr. 16; 405). The ALJ also discussed that Plaintiff experienced mood improvement while on medications (Tr. 20, 317, 378).

In developing the RFC at step four, the ALJ found that the prior administrative findings by the state agency consultants, Drs. DiFonso and Taylor, were persuasive and supported by Plaintiff's medical records overall. Specifically, the ALJ determined that the moderate limitations found by the Drs. Taylor and DiFonso in the areas of understanding, remembering, and in social interactions, including one or two-step instructions, are consistent with the evidence overall (Tr. 20).

Plaintiff argues that the state agency consultants found that Plaintiff has difficulty with persistence for extended periods of time, and that the ALJ did not properly account for that limitation in the RFC (Doc. 24, p. 11). A close look at the state agency examiners' reports finds otherwise. Dr. DiFonso did find that Plaintiff had a moderate impairment in his ability to CPP in the specific areas of carrying out detailed instructions and maintaining attention and concentration for extended periods of time (Tr. 50; 52). This finding is in the Mental Residual Functional Capacity Assessment (MRFCA). In the narrative part of Dr. DiFonso's report, he found that Plaintiff is "capable of multiple step productive activity [with] modified social demand" (Tr. 53). Like Dr. DiFonso, Dr. Taylor also found that Plaintiff had a moderate limitation in CPP, specifically in his ability to carry out detailed instructions and maintain attention and concentration for extended periods of time in the MRFCA (Tr. 65). Dr. Taylor explained in the narrative portion, however, that Plaintiff "retains the mental capacity to understand, remember, and concentrate sufficiently in order to carry out one or two-step instructions for a normal work period. He could make simple work related decisions" (Tr. 66).

In the ALJ's questioning to the VE at the hearing, the ALJ asked the VE to assess a hypothetical person the same age and with the same education level as Plaintiff with a moderate limitation in ability to understand, remember, and carry out detailed instructions, as well as a moderate limitation to maintain attention and concentration for extended periods of time (Tr. 41-42). This individual is therefore limited to performing simple, routine, one- and two-step tasks, and can perform work with production expectations, but the work must not be at any fast pace (such as an assembly line) where

the initiation of the task would be dependent on the individual's completion of the prior task. Additionally, the individual has a moderate limitation in the ability to interact with the public and to accept instructions and respond appropriately to criticism from supervisors, so the individual is limited to a work setting with reduced social demands and where the work setting and employment related social interactions are no more than occasional and are brief and largely task-specific rather than collaborative. Finally, the work setting must be stable with little change terms of the tools used, process employed, and the setting itself. Any change should be introduced gradually (Tr. 42).

The ALJ reiterated, almost verbatim, Dr. Taylor's description of Plaintiff's limitation in CPP from the narrative portion of his report in the hypothetical question posed to the VE. Dr. Taylor determined that Plaintiff's moderate limitation in CPP means that he could retain the mental capacity to understand, remember, and concentrate sufficiently in order to carry out one or two-step instructions for a normal work period (Tr. 66) and the ALJ used this terminology in his question to the VE. While Plaintiff attempts to argue that the ALJ did not account for Plaintiff's issue with his persistence deficit, he fails to cite to any portion of the record that the ALJ should have considered or that would have changed the ALJ's decision.

Seventh Circuit precedent does not require the ALJ to use specific words to express a claimant's limitations in maintaining CPP. "We decline to provide a glossary of adjectives for use in RFC determinations. What we do require—and our recent precedent makes plain—is that the ALJ must account for the totality of a claimant's limitations in determining the proper RFC." *Martin*, 950 F.3d at 374 (internal quotations omitted). That

is what the ALJ did here. An ALJ may reasonably rely on the narrative RFC when it is consistent with the "moderate" checklist ratings. *Pavlicek*, 994 F.3d at 783. The ALJ must consider whether the state agency consultants' narrative RFC assessments "adequately encapsulate[d] and translate[d]" the checklist." *Id,* citing *Varga*, 794 F.3d at 816. Furthermore, an ALJ may reasonably rely upon the opinion of a medical expert who translates these findings into an RFC determination. *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019), citing *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) (citing *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987) ("All that is required is that the hypothetical question [to the VE] be supported by the medical evidence in the record.")).

Plaintiff fails to point to any evidence in the record that the ALJ failed to address that supports his position. And like in *Pavlicek,* the ALJ here determined that the medical opinion evidence was persuasive and the moderate limitations determined by Drs. Taylor and DiFonso "are consistent with the evidence, including test scores in the borderline range, history of special education, and treatment records showing anxiety and depression but with otherwise intact cognition and judgement[sic]" (Tr. 20). *See Pavlicek,* 994 F.3d at 783 ("a 'moderate' limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace."). As with cases like *Martin* and *Pavlicek*, the ALJ in this case went beyond the formulaic statement of "simple, repetitive and routine tasks." The ALJ found, in fact, that Plaintiff can work within certain limitations, including performing simple, routine one-and two-step tasks with certain limited social interactions and demands, with a stable setting in

which there is little change in the setting, tools used, and the process employed (Tr. 19).

Plaintiff's arguments are little more than an invitation for this Court to reweigh the evidence. He has not identified any error requiring remand. Even if reasonable minds could differ as to whether Plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Burmester*, 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). The Court finds that the ALJ considered the record as a whole and properly weighed each medical opinion in accordance with the regulations. Plaintiff has cited no evidence demonstrating greater limitations are warranted than those incorporated by the ALJ in the RFC and has not identified any basis for reversal of the ALJ's decision. In sum, there is substantial evidence to support the ALJ's RFC determination.

## Conclusion

After careful review of the record as a whole, the Court concludes that the ALJ committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED: March 30, 2022**

s/Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**